CASE OF DAN HILL, PETITIONER.

Whether there can be a valid election of a representative without the agency of se-
    lectmen, *Quære.*

The act incorporating the town of Blackstone provided, that the town should remain
    for a certain period a part of the town of Mendon, for the purpose of electing a rep-
    resentative; that the warrants for calling meetings for the election of representatives
    should specify ten o'clock, A. M., as the hour at which the poll should be opened;
    and that the poll should be opened accordingly, and closed by one o'clock, P. M.
    It was held, that it was not necessary that the poll should be opened, but that the
    voters of the two towns might properly vote not to send a representative, and might
    thereupon dissolve a meeting called for the election of one.

A warrant for calling a meeting for the election of a representative specified 10 A. M.
    as the hour at which the meeting would be opened, and the weight of evidence was
    deemed to be, that the meeting was not opened before that time. After the meeting
    was called to order, a motion not to send a representative was made, on which the
    selectmen declared the vote to be a tie, but after a conference with the town clerk,
    who had also counted and found the vote to be against sending, put the question
    again, and declared the result to be a vote not to send. One who had voted in the
    minority then moved to reconsider this vote. Pending a discussion of his right to
    make the motion, a motion was made to dissolve the *warrant* and carried in the
    affirmative. This vote was doubted, but no notice was taken of the doubt; and
    the selectmen retired from the desk. A moderator was then chosen and an elec-
    tion had, of which the result was declared to be the choice of a representative,
    whose election was certified by the moderator, and by four persons who acted as
    his assistants. It was held, that such election was void.

A vote to dissolve the *warrant* (that being the usual motion in the town) is equiva-
    lent to a vote to dissolve the meeting.

THERE having been no return from the united towns of Men-
don and Blackstone, Dan Hill caused his petition to be pre-
sented, praying that he might be admitted to a seat as a
member, and this petition, with one of Newton Darling and
318 others, legal voters of Blackstone, in aid thereof, was re-
ferred[1] to the committee on elections, on the 11th of January.
On the 6th of February that committee reported[2] as follows:

" In the year 1845, the town of Blackstone was set off from
the town of Mendon. As the town of Mendon, at that time,
was entitled to only one representative, it was provided, in the
6th and 7th sections of the ' act to incorporate the town of
Blackstone,' as follows:—

' Sect. 6. The said town of Blackstone shall remain a part of the town of Mendon,
for the purpose of electing the representative to the general court, to which the town

[1] 69 J. H. 25.                    [2] Same, 196.

of Mendon is entitled, until the next decennial census of the inhabitants shall be taken, in pursuance of the thirteenth article of the amendments of the constitution. And the meeting for the choice of such representative shall be called by the selectmen of Mendon; and the warrant shall specify ten o'clock in the forenoon, as the time when the poll at such election shall be opened; and the same shall be opened accordingly, and be closed by one o'clock in the afternoon of the same day.

'Sect. 7. The selectmen of Blackstone shall make a true list of persons belonging to said town, qualified to vote at every such election, and the same shall be taken and used by the selectmen of Mendon, for such election, in the same manner as if it had been prepared by themselves. Such meetings shall be held in the towns of Mendon and Blackstone, respectively, in alternate years, commencing with the town of Blackstone; and the selectmen of Mendon shall appoint such place for every meeting to be held in Blackstone, as the selectmen of Blackstone shall, in writing, request.'

It appears, that on the second Monday of November last, at a meeting of the qualified voters of the two towns, held in Mendon, in conformity to the requirements of the law above recited, there was one balloting for a representative; that the whole number of ballots was 288, and that no person received a majority of the votes. At this meeting the petitioner was not a candidate.

Another meeting was called to be held at the same place, on the fourth Monday of November last, for the choice of a representative. It is admitted by the petitioner, that the warrant was duly issued by the selectmen of Mendon, that the voters were legally notified and warned, that the warrant was properly served and returned, and that the meeting was regularly called. It appears from an inspection of the warrant, that the voters were called upon to assemble punctually at 10 o'clock in the forenoon.

The petitioner states, in his memorial;—'That at the hour appointed for said meeting, (on the fourth Monday of November,) and within a few minutes of the precise time mentioned in said warrant, a large number of the qualified voters of said towns assembled at the place designated in said warrant, for the purpose of giving in their votes to the said selectmen, for a representative:—that the said selectmen, though present at said meeting, refused to open the poll, and, disregarding their own duty, and the rights of the citizens and voters there assembled, retired from their seats and refused to preside in the meeting:—Whereupon, the meeting called upon Emory Scott,

Esquire, chairman of the selectmen of Blackstone, to preside in said meeting, and to receive, sort, and count the votes for a representative; that the said Emory Scott opened the poll, and called upon the legal voters present to bring in their votes for such representative, and, after allowing all of said voters a fair opportunity to bring in their votes, the said presiding officer, with the aid of respectable gentlemen, (who had also, at his request, aided him as inspectors during the balloting,) did in open town-meeting sort and count the votes which had been brought in, and found that the whole number of said votes amounted to two hundred and two; that of this number your memorialist had one hundred and thirty-seven, and that all other persons voted for had sixty-five; whereupon it appeared that your memorialist, having a large majority of all the votes cast, was chosen a representative from said town, and the meeting was then dissolved. Wherefore, your memorialist claims that he is entitled to a seat in this house, as a representative from the town of Mendon.'

This is a statement of the case as presented by the petitioner himself. He has delivered to the committee a certificate of his election, which is in the common form, excepting, that instead of the selectmen, it is signed by Emory Scott, *moderator*, and Washington Hunt, William Legg, and Aaron Burdon, *assistants*.

The committee have examined several witnesses, and the material portions of their evidence will be submitted as a part of this report. Before proceeding, however, to introduce testimony, a preliminary question is suggested, which will now be considered. Assuming as true all the facts set forth in the memorial, could the petitioner have been legally elected? He alleges that the selectmen left their seats, and refused to preside at the meeting. This leads us to inquire whether there can be, in any case, a valid election of a representative which dispenses entirely with the agency of the selectmen?

The constitution, chapter second, section first, article third, provides, that votes for governor shall be given in ' to the selectmen who shall preside at such meetings;—and it is also

provided, chapter first, section second, article second, in relation to the choice of senators, that 'the selectmen of the several towns shall preside at such meetings impartially; and shall receive the votes of all the inhabitants of such town, present and qualified to vote for senators, and shall sort and count them in open town-meeting.' There is no such constitutional provision in relation to the choice of representatives, but some legislative enactment was soon found to be necessary. The constitution went into operation in the year 1780. On the 20th of April, 1781, a law was passed which required selectmen to call town-meetings for the choice of representatives in the general court, and to preside at and regulate said meetings, to furnish the person elected with a cetificate of his election, and cause him to be notified by a constable. Such has been the law on this subject from that time to the present.

The law now in force is contained in the fifth chapter of the Revised Statutes. The fifth section provides, that all meetings for the election of representatives shall be notified by the selectmen. The sixth section is in these words :—' The selectmen shall preside in such meetings, and they shall have all the powers which are vested in moderators of town-meetings ; they shall openly receive, sort, and count the votes there given by the qualified voters present, and shall forthwith publicly declare who are the persons elected.' The seventh section directs that the election shall be recorded in the town records. The eighth section makes it the duty of the selectmen, within three days, to cause the person chosen to be notified, and the ninth prescribes the form of a certificate to be given to him, which certificate is to be signed by them.

Some of these requirements have heretofore been decided by the house, to be mainly directory or mandatory to the selectmen, and not essential to the validity of an election. Such, for example, is the eighth section, requiring the representative to be notified of his election by a constable. A case of this description from South Reading has been so decided by the house,[1] since the commencement of the present session. A

[1] See Report on the Returns of Members for 1845, and note.

71

similar case occurred in the year 1837.[1]     Official notice is
required to be given to the member elect, for the purpose of
securing his attendance at the opening of the session.     But, if
he takes his seat without having received such notice, no injury
accrues, although the selectmen, for their neglect of duty, are
liable to the penalties of the law.     So, if the election should
not be recorded in the town records, as required in the seventh
section, such omission would not probably be deemed suffi-
cient to invalidate an election, which could be proved, without
the records, to have been fairly made.     These two sections re-
quire duties to be performed after an election has been effected.
But it is difficult to imagine how any election can be legal,
unless the meeting is, first, regularly warned, and secondly,
unless the selectmen, who are sworn officers, open the poll,
and receive, sort, and count the votes.

The committee are not aware of any decision of the house,
which seems in the slightest degree to conflict with the opinion
here presented, unless it is the case of Firgus McLain, re-
turned a member from the town of Hope, in the county of
Lincoln, in the political year 1809–10.[2]     It is stated in that
case, that McLain's seat was controverted on the ground, that
a moderator presided at his election instead of the selectmen,
and that this fact was proved by depositions.     The commit-
tee have not had access to the original papers in that case,
except to the certificate of the member, which is in the usual
form and signed by the selectmen, and contains a constable's
return that he had given the requisite notice.     The only in-
formation to be procured from the journal of that year is, that,
on the 24th of February, 1810, the committee on elections re-
ported, 'that the town of Hope is entitled to a representative,
and therefore that Firgus McLain is entitled to a seat in this
house.'     The report was agreed to.     It appears, from the fact
of giving the certificate, that the selectmen recognized the
meeting as conducted by their agency and under their official
supervision.     From the language used by the committee, as
appears from the journal, there is some doubt on what ground

[1] Ante, 347.                    [2] Ante, 71.

they reported in favor of McLain. During that year, the seats of several members, from towns incorporated since the adoption of the constitution, were controverted because those towns did not respectively contain 150 ratable polls. That objection, as well as the choice of a moderator, might have been alleged by the petitioners, against the right of McLain to his seat. If such an objection was made and overruled, the language of the committee is intelligible; otherwise their report, or the substance of it, as stated in the journal, is absurd.

It may be said, that if no meeting is or can be legal without the agency of the selectmen, they have it in their power, by neglecting or refusing to perform their duty, to deprive a town of its constitutional right of representation. Admitting that such would be the result, let us inquire whether there is any serious danger to be apprehended, from any such flagrant abuse of power by selectmen. They are citizens called to the discharge of important public duties, usually selected for their intelligence, integrity and capacity for business, and sworn to the faithful discharge of their trusts; and, for wilful neglect of duty or misconduct in office, they are liable to the pains and penalties of the law. These safeguards, it is believed, have generally been considered sufficient to protect the rights of the people against any wanton abuse of power by selectmen. If, however, the penalties now provided by law, to be inflicted on town officers for neglect of duty, are insufficient, they ought to be increased.

Entertaining these views, the committee were inclined to the opinion, that, admitting as true all the facts set forth in the memorial, the petitioner was not legally chosen, and is not entitled to a seat as a member of this house. They felt unwilling, however, to dismiss the case without giving both parties a full hearing. The evidence offered by the petitioner will be understood by referring to the extract from his memorial already given. The testimony adduced by the selectmen, in their defence, is designed to show, that the meeting on the 24th of November was not opened before 10 o'clock in the forenoon, (the time appointed by law as before stated,) that after the

meeting was opened, a motion was made not to send a representative, that the motion prevailed, and that the meeting was dissolved."

The following is a part of the evidence for the petitioner:—

"The following paper in the original was delivered to the committee by the petitioner, and appears to be a record of the votes given in at the meeting at which he claims to have been elected.

| 'Arnold Taft, | - | - | - | - | 4 |
| William Wood, | - | - | - | - | 1 |
| Josiah Webster, | - | - | - | - | 31 |
| Sumner Ballou, | - | - | - | - | 4 |
| Samuel W. Doggett, | | - | - | - | 25 |
| Dan Hill, | - | - | - | - | 137 |

$\frac{1}{2})202$

102

S. W. Doggett, 12 in one piece of paper.
Same,        19 in one piece of paper.
The above two pieces of paper were counted as two votes for Samuel W. Doggett.

The above is a true count of the votes at a meeting held at Harrison Hall, in Mendon, on Monday the twenty-third day of November, A. D. 1846, as counted by me, Emory Scott, Moderator. Attest, Washington Hunt, William Legg, Aaron Burdon, Alexander H. Allen.'

Emory Scott testified as follows:—" I am the chairman of the selectmen of Blackstone, and was present at the opening of the town-meeting, in Mendon, on the 23d of November last; was invited by the selectmen of Mendon, to assist in entering the names of voters on the check list, and did so; had brought with me the list of the voters of Blackstone; there were 446 names on the check list of Blackstone. At the time of opening, there were some forty or fifty persons present. An inquiry was made of Leonard Taft, the chairman of the selectmen of Mendon, if the time of opening the meeting had arrived. The chairman asked some one for the time, and the reply was, that it was 10 o'clock and after. I asked James A. Baldwin if it was 10 o'clock; he replied that it was 10 and a little after, by his time; my impression is, that he said it was ten minutes after 10 o'clock. The chairman, Mr. Taft, called the meeting to order, and then read the warrant and the officer's return. A motion was then made by Mr. Samuel W. Doggett, not to send a representative to the general court. The chairman put the motion, and declared it a vote not to send a representative. Some one doubted the vote. The chairman then called on those in favor of not sending a representative to hold up their hands; then he called on those of a contrary opinion to express it in the same manner, and declared it was a tie. The town clerk disagreed, making a majority of one in favor of not sending. Some called on the chairman to untie it,—some, to try the vote again. He put the motion again, and declared it was a vote not to send. I then made a motion to reconsider that vote. C. C. P. Hastings objected to my right to make the motion, having voted in the minority. Immediately Mr. Doggett moved to dissolve the warrant. The chairman made no decision as to whether my motion was in order. I was within five feet of the chairman. He called on those in favor of dissolving the warrant to hold up their hands; then on those opposed; and then stated it was a vote, 28 to 24, to dissolve the warrant. No other

declaration was made. I immediately doubted the vote. Mr. Doggett called back a portion of the people who had started to go out, saying, there is more voting to be done. Most of them returned. In a minute after, Mr. Leland, one of the selectmen, who had been conversing with the chairman, turned to me and said, The doubt is too late; you ought to have made it before. I replied, that I could not have made the doubt before the declaration of the vote, and urged upon the selectmen, as well as I could, in the confusion, that some notice should be taken of the doubt. Mr. Leland again said, It is too late. I said to the chairman, that I expressed the doubt in season. He made no reply. While we were standing, Mr. Hill and a large number from Blackstone came in. Mr. Hill endeavored to get an opportunity to address the meeting. As far as I could understand, he was trying to ascertain the state of the meeting. Such was the confusion, that Mr. Hill spoke very loud in order to be heard. After two or three attempts he did succeed, and stated to the selectmen that the right of representation was a constitutional right; that the people had a right to vote, and were not in this way to be deprived of their rights. The selectmen were standing in their places. Mr. Hill demanded that the votes should be received, and very soon several stepped up and demanded that their votes should be received. The chairman, being in the desk, said there was no meeting. He afterwards left the desk. Mr. Hill made a motion to choose a chairman, proceed to the choice of a representative, and bring the case before the legislature. They proceeded to choose a chairman, and I was elected by hand vote. I remarked that I would preside as chairman or moderator, but not in my official capacity as a selectman of Blackstone, and took the chair. Messrs. Washington Hunt, Aaron Burdon, William Legg, of Blackstone, and Alexander W. Allen, of Mendon, were invited to act as assistants, to prevent illegal voting. I called on the inhabitants to bring in their votes for representative. The poll was kept open about an hour and a half. I made and signed a record of the result of the voting. The two pieces of paper therein mentioned were rolled up to the size of one vote, and in that way got in. This record was made up before leaving the desk. A vote was then taken to dissolve the meeting. Two meetings for the choice of representative were held last year; the first was warned to meet at 9—the poll to be opened at 10 o'clock, A. M.; the second was notified to meet at 10 o'clock. It has been our custom to delay opening our town-meetings till some time after the hour named in the warrant. It was a common remark, in respect to town-meetings, among the voters, that they would have an hour before opening. Messrs. Legg, Burdon, and Hunt, have represented the town of Mendon in the legislature. Mr. Allen has been selectman and town clerk.

I do not recollect whether my motion to reconsider the vote not to send a representative was seconded. It is customary with us to put motions that are not seconded. Mr. Hill exhibited a good deal of feeling, and spoke loudly and earnestly. He said whoever was chosen representative would hold his seat. I suppose over 300 voters were present. Some attempted to vote twice. I charged some with attempting it, and they admitted it. Some might have voted twice; I know of none that did so. A handful of votes was thrown at the hat, but did not fall into it. At another time, a handful was put on the top of the hat; but, they adhering together, were all taken out. Before the division of the town, a motion not to send a representative was frequently made at the opening of the meeting; but there was usually an article in the warrant touching that question. Since the year 1840, the representative has been taken alternately from the sections now called Mendon and Blackstone. Last year the selection was from Blackstone. No exceptions, as to the time of opening the meeting, were taken."

Joseph Wheelock testified as follows :—" I called at the store of Davenport & Aldrich, on the morning of the 4th Monday of November. When I left for the place of meeting, it was just five minutes before 10, A. M., by the clock in the store. Went with E. Lamb directly to the hall, a distance of eight or ten rods. As I was going up the steps, I heard some one say ' I doubt it.' The selectmen were in their seats. S. W. Doggett asked them by what authority they kept their seats, and requested them to leave ; they soon after withdrew. I do not know whether the clock in the store was right. I formerly lived in Mendon, and the clock in the store was then considered as a standard for time. I heard no motion made after I entered the hall."

The following evidence was introduced on behalf of the selectmen of Mendon : —

### COPY OF RECORD.

"*Mendon, November* 23, 1846.—At a legal meeting of the inhabitants of the towns of Mendon and Blackstone, qualified to vote in elections and in town affairs, held this day at Harrison Hall in said Mendon, agreeably to the foregoing warrant, the following votes were passed, to wit : —

Voted, not to choose a representative to represent the towns of Mendon and Blackstone in the general court to be held at Boston on the first Wednesday in January next.

Voted to dissolve the warrant. Attest, Putnam W. Taft, Town Clerk. A true copy of record : Attest, Putnam W. Taft, Town Clerk of Mendon."

Putnam W. Taft testified as follows :—" I am town clerk of Mendon ; was at town-meeting in Mendon on 23d November last. A motion not to send a representative was made immediately after reading the warrant. The vote was taken ; a doubt was raised. A count was then made by the selectmen, who made it a tie ; I also counted and made a majority of one in the affirmative. The vote was again taken and decided, by a majority of one or two, not to send a representative. A motion was then made to reconsider this vote, not to send, by Mr. Emory Scott, and, before the vote to reconsider was taken, a motion to dissolve was made and carried. The vote to dissolve was carried by 28 to 24. The meeting was called to order at ten minutes past 10, A. M., by my watch. I should think not far from twenty minutes elapsed between the opening and the dissolution of the meeting. I suppose my watch indicated the true time ; am positive it was between five and ten minutes past 10 o'clock ; have sometimes altered my watch ; having let it run down, I set it that morning by the clock."

Stephen Taft testified as follows :—" I have held different town offices in Mendon, for about nine years ; have been selectman three years, and attended every town-meeting for nine years except one. The representative has been taken from the two parishes, now forming Blackstone and Mendon, alternately. It was understood that the selection this year was to be from Mendon. I arrived before the meeting on the 23d of November was opened. The warrant was read, and no objection was made to opening the meeting. Soon after the warrant was read, a motion was made by Mr. Doggett, and seconded by myself and several others, ' that we vote not to choose a representative.' This motion was put by the chairman, and declared to be a vote ; a doubt was expressed, and the chairman called on those in favor of not choosing a representative, to hold up their hands till counted ; then on those opposed by the same sign. The chairman declared he made it a tie, but said, ' we disagree.' Some said, ' if you have not voted, untie the vote ;' others requested him to try the vote again. He accord-

ingly put the motion again, and counted as before, and declared it was a vote, not to send a representative; think he declared the affirmative and negative. Mr. Scott then moved to reconsider it; did not hear his motion seconded. C. C. P. Hastings inquired if he voted in the negative or affirmative. Mr. S. replied, in the negative. Mr. H. then questioned his right to move a reconsideration. Pending this, a motion was made to dissolve the meeting or warrant. Mr. Scott insisted on his motion being tried. Some remarked, that a motion to dissolve took precedence of all others. I remarked to the chairman, that if the motion to dissolve was put, it would in effect try the sense of the meeting on Mr. Scott's motion. The motion to dissolve was then put, and decided by a count both of the affirmative and negative, and it was declared to be a vote to dissolve. The meeting up to this time was as orderly as usual. Mr. Scott very soon said, 'I doubt the vote;' said it two or three times quite low and not very distinctly; but I was near and heard him. Mr. S. was in the desk. It did not appear to me that he addressed the selectmen. I said to him, 'the affirmative and negative have been tried, and you may doubt all day.' Heard no other person express a doubt. I have no means of ascertaining the time of opening the meeting. The time, intervening between the reading of the warrant and the dissolution, could not have been much less than half an hour, or from 20 to 30 minutes. The votes were passed as deliberately as is usual in town-meetings. I saw Mr. Hill in the hall before the selectmen left the desk; a number came in at the same time. Mr. Hill appeared considerably excited, and inquired the state of business in the meeting. There was considerable noise; several were speaking. Mr. H. went to the desk and demanded his right to vote; others demanded that the poll should be opened. The selectmen remarked that the meeting was dissolved, and they had no right to receive votes, and soon left the desk. Mr. Scott was nominated as chairman of the meeting. The motion was put and declared to be a vote. Mr. S. said he would preside, as he has stated in his testimony. The assistants entered the desk with him. He then called for votes for representative. Some were disorderly; no order was requested. Before the close, the meeting became as orderly as could be expected. I saw votes thrown at the cap; saw none fall into it. I saw two persons go up deliberately and vote twice, and am of opinion there was considerable illegal voting. The poll was kept open an hour or an hour and a half, as long as any votes were offered. At the opening of the meeting, I looked around to see the probable number, and there must have been 100 voters present. Should think from 300 to 400 were there that day. The opening of our common town-meetings has been usually past the time appointed by fifteen minutes, half an hour, or an hour. At election meetings, it has been different; these have generally been opened as near the time appointed as possible. In one half of the meetings holden for the election of representative, a motion has been made at the opening not to send. At the meeting at which Mr. Scott presided, I heard the right of no one to vote doubted, no check list was used, a great many did not vote.

I should judge there were more present at the time the meeting was declared to be dissolved by the selectmen than at the opening."

William H. Aldrich testified:—"I am clerk in the store for Davenport & Aldrich. On the 23d of November last, Putnam W. Taft, the town clerk, was in the store, and he left the store five minutes past 10, A. M., by the clock in the store. Knowing him to be town clerk, and that the meeting was called at 10 o'clock, I thought it was time that he should be at the meeting, and this was the reason why I noticed the clock. We mean to keep the clock right, on account of the arrival and departure of the mails, and I believe it was right. I am assistant postmaster. The post office is kept in the store."

Several other witnesses were examined, but as their testimony does not differ, in any material respect, from that which is given above, it is not thought necessary to insert it. The committee further report as follows : —

" The petitioner was heard before the committee by his counsel, Charles T. Russell, Esq., who claimed for his client a right to a seat on the following grounds :—

' The meeting was legal at which he was elected. The constitution provides that a representative shall be chosen by written votes. This was done, and the petitioner had a large majority of those votes.

But it is said, the meeting had previously voted not to send a representative, and voted to dissolve itself. This the petitioner denies :—

1. Because, by the act incorporating Blackstone, it was not competent for the voters of either or both towns to vote not to send a representative, and to dissolve the meeting, without opening the poll. Act of 1845, c. 201, § 6.

2. Because, there being no article in the warrant to see if the towns would vote to send, and thus no intimation given to the people that such a vote would be put, but the warrant being simply to give in their votes for a representative, it was not competent for the meeting to act on the subject of sending or not sending. Rev. Stats. c. 15, § 21.

3. Because the only vote pretended to have been passed was " to dissolve the warrant," and not the meeting.

4. Because, in point of fact, no vote was ever legally passed to dissolve the meeting.

And upon this fourth point the petitioner insists that no such vote was passed :—

1. Because, if passed at all, it was before ten o'clock, the hour at which the meeting was called ; or was predicated upon other votes, which had no legal effect, because passed before that hour.

2. Because, if such vote was passed, it was upon the assumption that a previous vote not to send had passed, which had never legally passed.

On the trial of this question the selectmen all counted and declared it " a tie," and as no one doubted the vote, they had no right to put it again; still, at the cry of some of the voters " to try it again," they did so, and declared it a vote. Whereas, the petitioner insists that the first vote, being ascertained by a count and declared, and not doubted, was conclusive.

3. Because, the moment such vote to dissolve was declared by the selectmen, Mr. Scott rose in his place and doubted the same, and the selectmen, hearing said doubt, refused to make the vote certain; and because, had they proceeded to make it certain, it would have been decided a clear and large vote not to dissolve the meeting.

But it is said the election is void:—

1. Because the selectmen did not preside. But if the meeting was not dissolved, then this was a palpable neglect of duty by them, and cannot disfranchise the town. Is the servant greater than his master? Can this great constitutional right be taken from 700 or 800 voters by the mere neglect of these officers?

The only requisitions of the constitution are as to the day of the meeting and written votes. All the other provisions are those of the Revised Statutes, and are mandatory upon the selectmen; but a non-compliance with them does not defeat an election and disfranchise a town.

That the fact, that the selectmen did not preside, does not vitiate the election, was settled in the case of the town of Hope.[1] See also the case of Chelsea.[2]

But it is said, that the check list was not used. But this does not invalidate an election, where the non-user of it is the act of the selectmen, or officers, and not by vote of the town. Westborough.[3]

But it is said, there is no certificate, record, &c. This will not invalidate where there has really been an election. Whately (1843);[4] Holland.[5]

Only two illegal votes are shown to have been thrown; deduct these, and Mr. Hill still has seventy majority.

[1] Ante, 71.　　[2] Ante, 474.　　[3] Ante, 392.　　[4] Ante, 439.　　[5] Ante, 366.

The petitioner stands here vindicating a great constitutional right, and the legislature will give that right force and efficiency, and carry out the well-expressed voice of the people, where they can. They will not seek to crush this right by the very forms intended to preserve it.'

The committee have felt disposed to furnish the petitioner with every facility in their power to make a full and fair statement of his case; and, for that purpose, have presented, in a condensed form, the ingenious argument of his counsel. The committee, however, do not think it necessary to reply in detail to the several points in the case made by the petitioner's counsel. A few comments only will be made.

The committee are of opinion, that the act of 1845, incorporating the town of Blackstone, was not intended to impair or restrict any right, which, before the passage of the act, was enjoyed by the town of Mendon; and, therefore, that the united towns may lawfully vote, if they please, not to send a representative. It has been often decided by the house, that a town, without any article in the warrant for that purpose, may legally vote not to elect a representative.

The case of Firgus McLain, from the town of Hope, has already been considered. That part of the Chelsea case referred to is taken from the majority report of the committee, which was not agreed to. The minority report was substituted by the house for that of the majority.

The committee, having presented a full report of the evidence, think that comment is unnecessary. There is a little discrepancy in the testimony, but it appears that the meeting was not opened before 10 o'clock, and that it was quiet and orderly until it was dissolved.

The committee unanimously recommend, that the petitioner have leave to withdraw his petition."

The foregoing report was ordered to be printed,[1] and, on the 20th of February was read and agreed to.[2]

A motion, that pay should be allowed to Mr. Hill, from the day on which his petition was presented, to that on which the

[1] 69 J. H. 196.        [2] Same, 304.

committee made their report, was made[1] on the 5th of March, postponed to the next day, and then [2] rejected.

[1] 69 J. H. 399.　　　　　　　[2] Same, 406.